# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# MILWAUKEE DIVISION

| | |
|---|---|
| RACHEL HOLMES, Individually and on Behalf of All Others Similarly Situated, | Case No.: 19-cv-208 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **Jury Trial Demanded** |
| RADIUS GLOBAL SOLUTIONS LLC, | |
| Defendant. | |

## INTRODUCTION

1. This class action seeks redress for collection practices that violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA") and the Wisconsin Consumer Act, Chs. 421-427, Wis. Stats. (the "WCA").

## JURISDICTION AND VENUE

2. The court has jurisdiction to grant the relief sought by the Plaintiffs pursuant to 15 U.S.C. § 1692k and 28 U.S.C. §§ 1331, 1337, and 1367. Venue in this District is proper in that Defendant directed its collection efforts into the District.

## PARTIES

3. Plaintiff Rachel Holmes is an individual who resides in the Eastern District of Wisconsin (Milwaukee County).

4. Plaintiff is a "consumer" as defined in the FDCPA, 15 U.S.C. § 1692a(3), in that Defendants sought to collect from Plaintiff a debt allegedly incurred for personal, family or household purposes.

5. Plaintiff is also a "customer" as defined in the WCA, Wis. Stat. § 421.301(17), in that the alleged debt Defendants attempted to collect from Plaintiff arose from a consumer transaction with an agreement to defer payment.

6. Defendant Radius Global Solutions, LLC ("Northland") is a foreign corporation with its principal place of business located at 7831 Glenroy Rd., Suite 250, Edina, Minnesota 55439.

7. Northland was formerly incorporated under the name "Northland Group." *See, e.g., Henry v. Radius Global Solutions, LLC*, No. 18-cv-4945, 2019 U.S. Dist. LEXIS 9006, at *2 (E.D. Penn. Jan. 18, 2019).

8. Northland is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

9. Northland is engaged in the business of collecting debts owed to others and incurred for personal, family or household purposes.

10. Northland is a debt collector as defined in 15 U.S.C. § 1692a and Wis. Stat. § 427.103(3).

## FACTS

11. On or about February 10, 2018, Northland mailed a debt collection letter to Plaintiff regarding an alleged debt owed to "CITIBANK, N.A." ("Citibank"). A copy of the letter is attached to this complaint as Exhibit A.

12. Upon information and belief, the alleged debt referenced in Exhibit A was incurred by use of a credit card, used only for personal, family, and household purposes.

13. Upon information and belief, Exhibit A is a form letter, generated by computer, and with the information specific to Plaintiff inserted by computer.

14. Upon information and belief, Exhibit A is a form debt collection letter, used by Northland to attempt to collect alleged debts.

15. Exhibit A contains the following:

2

Case 2:19-cv-00208-PP    Filed 02/08/19    Page 2 of 19    Document 1



16. <u>Exhibit A</u> directs all payments and correspondence to Northland:

> **Pay Online:** www.payments2northland.com
>
> **Pay by Phone:** Please call Northland Group at 866-390-2348 ext 3169. We offer check by phone, Western Union, and debit card.
>
> **Pay by Mail:** Send payments to PO Box 390905, Minneapolis, MN 55439.

17. <u>Exhibit A</u> also contains the following:

> The creditor will allow you to settle your account for $325.80 in 12 payments over 12 months starting on 03/03/2018. If you need additional time to respond to this offer, please contact us. We are not obligated to renew this offer. Once all 12 payments of $27.15 have been paid to our office on time, a letter will be sent confirming the above referenced account has been resolved. Make check payable to Citi.
>
> Payments must NOT be more than 30 days apart or this settlement will be cancelled. Please send payments to the address above.

18. <u>Exhibit A</u> thus states that, as of February 10, 2018, Northland is collecting an alleged debt Plaintiff owed to Citibank in the amount of $896.62.

19. <u>Exhibit A</u> also includes an offer to settle the account for $325.80 spread over twelve monthly installment payments.

20. To accept the settlement offer included in <u>Exhibit A</u>, the letter indicates that the first payment must be received by March 3, 2018. Additionally, <u>Exhibit A</u> states "Payments must NOT be more than days apart or this settlement will be cancelled."

21. <u>Exhibit A</u> also states "We are not obligated to renew this offer."

3

22. The statement that the debt collector is "not obligated to renew this offer," is the Seventh Circuit's "safe-harbor" language, which is meant to ensure that the consumer understands that "renewal is a possibility" but that it is not "assured."

23. This safe-harbor language does not exculpate a debt collector from false liability for a false statement elsewhere in a debt collection letter and may even itself be false or misleading. *Al v. Van Ru Credit Corp.*, 2018 U.S. Dist. LEXIS 70321, at *9-10 (E.D. Wis. Apr. 26, 2018) (citing *Boucher v. Fin. Sys. of Green Bay*, 880 F.3d 362, 366-67 (7th Cir. 2018).

24. The March 3, 2018 settlement offer deadline stated in Exhibit A is a material statement of fact about when the offer would be available from Northland.

25. The unsophisticated consumer receiving Exhibit A would understand that Northland would be authorized to collect his account through at least March 3, 2018 and would understand that Northland may even renew the settlement offer in Exhibit A if he had not responded by March 3, 2018.

26. The unsophisticated consumer would, at the very least, know that, as of February 10, 2018, "there is a renewal possibility but that it is not assured." *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007).

27. On or about February 26, 2018, non-party ARS National Services, Inc. ("ARS") mailed a collection letter to Plaintiff regarding the same alleged debt owed to Citibank. A copy of the letter is attached to this complaint as Exhibit B.

28. The alleged debt owed to Citibank referenced in Exhibit B lists the same balance of $869.62 as the balance listed in Exhibit A as well as the same account number ending in 7532.

29. Upon information and belief, Exhibit B is a form letter, generated by computer, and with the information specific to Plaintiff inserted by computer.

30. Upon information and belief, Exhibit B is a form debt collection letter, used by ARS to attempt to collect alleged debts.

31. Upon information and belief, Exhibit B was the first written communication ARS mailed to Plaintiff regarding the alleged debt referenced in Exhibit B.

32. Exhibit B contains the statutory debt validation notice that the FDCPA, 15 U.S.C. § 1692g, requires the debt collector mail the alleged debtor along with, or within five days of, the initial communication:

> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

33. Exhibit B also contains the following:

> **ACCOUNT IDENTIFICATION**
> Creditor: Citibank, N.A.
> Account No.: *************7532
> ARS Reference No.: ▮5934
> Balance: $896.62

34. Exhibit B also contains a payment remittance slip, which contains the following:

> There are other payment options available. To review payment options 24 hours a day, please visit our website at www.PayARS.com. To access your account, you'll be asked to provide your ARS Reference Number (▮5934). ARS also offers "Quick Check" by phone, Western Union "Quick Collect" (Code City: ARS 36315934), and Moneygram "Express Payment" (Receive Code: 2471). Payments, made payable to Citibank, can be mailed to the ARS Escondido, CA address above.

35. On the face of Exhibits A & B, it is impossible to determine who is authorized to collect the debt as of the dates of Exhibits A & B, and whether Northland and/or ARS are acting illegitimately.

36. Northland mailed Exhibit A on or about February 10, 2018, offering the consumer options to resolve the account with a deadline of March 3, 2018 (about three weeks after the date

5

of Exhibit A), but ARS mailed Exhibit B just two weeks later, on or about February 26, 2018 (about a week before the deadline stated in Exhibit A had lapsed).

37. Debts like the one referenced in Exhibits A & B are intangible personal property known as choses in action, which are not only assignable but are traditionally understood as having bifurcated title: legal title and equitable title. *See Unifund CCR Partners v. Shah*, 993 N.E.2d 518, 521 (Ill. App. Ct. 1st Dist. 2013).

38. Where the creditor of a debt hires a third-party collection agent who attempts to collect the debt in the collection agent's own name the creditor assigns legal title to the chose in action, but retains equitable title. *Unifund CCR Partners v. Shah*, 993 N.E. N.E.2d 518, 521 (Ill. App. Ct. 1st Dist. 2013) (citing *Sprint Communs. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 276-77 (2008)).

39. On the face of Exhibits A & B, it is impossible to determine whether Northland or ARS had legal title to the debt referenced in Exhibits A & B as of the dates of Exhibits A & B.

40. On the face of Exhibits A & B, it is impossible to determine whether Northland or Citibank contracted with ARS to mail Plaintiff Exhibit B.

41. The misleading and confusing settlement offer deadline in Exhibit A is, by definition, material because it is a deadline for acceptance of the offer. *Evory*, 505 F.3d at 775-76; *Al*, 2018 U.S. Dist. LEXIS 70321, at *8; *see also, Smith v. Nat'l Enter. Sys.*, 2017 U.S. Dist. LEXIS 47701, at *12-14. (Mar. 30, 2017).

42. The consumer would undoubtedly be left wondering whether Northland's settlement offer was still available. *Brown v. Alltran Fin. LP*, No. 18-cv-409, 2018 U.S. Dist. LEXIS 193434, at *4-6 (W.D. Wis. Nov. 13, 2018) (plaintiff stated FDCPA claim defendant's

6

collection letter stated a settlement offer deadline but he received a dunning letter regarding the same account from a different collection agency before the settlement offer deadline).

43. The consumer would undoubtedly be left scratching her head and wondering whether Exhibit A and/or Exhibit B was a scam, and whether Northland, ARS, or someone else was legally authorized to collect payment. *See, e.g., Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 324-25 (7th Cir. 2016):

> Suppose the sender of these letters had not been [the authorized debt collector] but a party who had no legal right to collect the debts on [the creditor's] behalf – perhaps someone who gathered debt information from public court records. The letters did not identify who currently owned the debts, so a consumer wishing to verify that a payment would extinguish her obligation could not contact the current creditor to confirm that paying the letter-writer would be the proper course of action. In fact, the [debt collection] letters actually instructed consumers to direct all further contact not to [the creditor] but to [the debt collector] itself. Unless the unsophisticated consumer makes the effort to demand verification under § 1692g, an unscrupulous sender could confirm that that the consumer should send it a payment to extinguish the debt. That consumer would find that she had lost money while her actual debt remained unpaid.

44. The unsophisticated consumer would also be confused and misled as to whether the settlement offer stated in Exhibit A was still available to the consumer as of the date of Exhibit B. Exhibit A states that "we" are making the offer and that "we" are not obligated to renew it, so the consumer would not know whether the same offer would be available from some other debt collector.

45. Moreover, the confusion and misrepresentation inherent in the disclosure of the chain of title of the debt referenced in Exhibits A & B is material.

46. Even a consumer who assumed the debt was valid would be confused and misled upon receiving debt collection letters from two different debt collectors within a span of a few days, especially where both letters directed the debtor to tender payment to the debt collector rather than the creditor.

7

47. The consumer would not know whether Northland had actually purchased the debt, and ARS was authorized the collect the debt on Northland' behalf.

48. Even if the consumer did think Northland had purchased the debt, the consumer would have no way to determine which debt collector should receive the payment, which would increase the risk of double-payment of the same debt, and whether the settlement offer stated in Exhibit A was still available to the consumer.

49. Additionally, Exhibit A offers that the debtor may pay the debt off in installments, whereas Exhibit B does not offer these installment plans.

50. Based on Exhibits A & B, it is impossible to determine the chain of title to the debt.

51. It is possible that Citibank assigned legal title to the debt to Northland, and Northland assigned legal title to ARS (*i.e.,* ARS was acting on behalf of Northland, who was acting on behalf of current creditor Citibank), in which case the debt would still be subject to the settlement offers Northland offered.

52. It is also possible that Citibank assigned both legal and equitable title to Northland (*i.e.,* ARS was acting on behalf of current creditor Northland), and Northland assigned legal title to ARS, in which case the debt would still be subject to the settlement offers Northland offered.

53. But it is also possible that Citibank assigned legal title to the debt to Northland, but Northland returned legal title to Citibank, and Citibank subsequently assigned legal title to ARS, in which case the settlement offers stated in Exhibit A would no longer be on the table. *See* Exhibit B ("**We** are presenting three options …. **We** are not obligated to renew this offer.") (emphasis added).

8

Case 2:19-cv-00208-PP    Filed 02/08/19    Page 8 of 19    Document 1

54. Based on Exhibits A & B, there is no way to determine whether the settlement offer stated in Exhibit A is still available as of the date of Exhibit B, which is one week prior to the offer deadlines stated in Exhibit A.

55. Moreover, pursuant to 15 U.S.C. 1692g, Exhibit B informs the consumer she may dispute the debt, and that she may require the debt collector to obtain verification of the debt by providing the debt collector with written notification of the dispute.

56. The March 3, 2018 deadline for the settlement offer in Exhibit A, which would elapse only a few days before Plaintiff received Exhibit B, is therefore inconsistent with and overshadows the disclosure in Exhibit B in that a consumer wishing to take advantage of the settlement offer may be motivated to tender payment to Northland before exercising their validation rights with respect to ARS.

57. Upon information and belief, Citibank assigned legal title to Northland, but recalled the account sometime after Exhibit A was mailed and before Exhibit B was mailed.

58. Upon information and belief, Citibank assigned legal title to ARS sometime after Exhibit A was mailed but before Exhibit B was mailed.

59. The unsophisticated consumer cannot be expected to understand that this is what happened, particularly where he received Exhibit B before settlement offers stated in Exhibit A actually expired.

60. Upon information and belief, when Northland mailed Exhibit A it knew that, unless the consumer responded to Exhibit A, it would be returning the account to Citibank.

61. Plaintiff was misled by Exhibits A & B.

62. The unsophisticated consumer would be confused and misled by Exhibits A & B.

### *The FDCPA*

9

63. The FDCPA creates substantive rights for consumers; violations cause injury to consumers, and such injuries are concrete and particularized. *Derosia v. Credit Corp Solutions*, 2018 U.S. Dist. LEXIS 50016, at *12 (E.D. Wis. Mar. 27, 2018) ("'a plaintiff who receives misinformation form a debt collector has suffered the type of injury the FDCPA was intended to protect against' and 'satisfies the concrete injury in fact requirement of Article III.'") (quoting *Pogorzelski v. Patenaude & Felix APC*, 2017 U.S. Dist. LEXIS 89678, 2017 WL 2539782, at *3 (E.D. Wis. June 12, 2017)); *Spuhler v. State Collection Servs.*, No. 16-CV-1149, 2017 U.S. Dist. LEXIS 177631 (E.D. Wis. Oct. 26, 2017) ("As in Pogorzelski, the Spuhlers' allegations that the debt collection letters sent by State Collection contained false representations of the character, amount, or legal status of a debt in violation of their rights under the FDCPA sufficiently pleads a concrete injury-in-fact for purposes of standing."); *Lorang v. Ditech Fin. LLC*, 2017 U.S. Dist. LEXIS 169286, at *6 (W.D. Wis. Oct. 13, 2017) ("the weight of authority in this circuit is that a misrepresentation about a debt is a sufficient injury for standing because a primary purpose of the FDCPA is to protect consumers from receiving false and misleading information."); *Neeley v. Portfolio Recovery Assocs., LLC*, 268 F. Supp. 3d 978, 982 (S.D. Ind. Aug. 2, 2017) ("[N]othing in *Spokeo* overruled the Seventh Circuit's decisions that emphasized and affirmed the power of Congress to pass legislation creating new rights, which if violated, would confer standing under Article III.") (alteration in original) (quoting *Saenz v. Buckeye Check Cashing*, 2016 U.S. Dist. LEXIS 127784, at *5 (N.D. Ill. Sep. 20, 2016); *Qualls v. T-H Prof'l & Med. Collections, Ltd.*, 2017 U.S. Dist. LEXIS 113037, at *8 (C.D. Ill. July 20, 2017) ("Courts in this Circuit, both before and after *Spokeo*, have rejected similar challenges to standing in FDCPA cases.") (citing "*Hayes v. Convergent Healthcare Recoveries, Inc.*, 2016 U.S. Dist. LEXIS 139743 (C.D. Ill. 2016)); *Bock v. Pressler & Pressler, LLP*, No. 11-7593, 2017 U.S. Dist. LEXIS

81058 *21 (D.N.J. May 25, 2017) ("through [s]ection 1692e of the FDCPA, Congress established 'an enforceable right to truthful information concerning' debt collection practices, a decision that 'was undoubtedly influenced by congressional awareness that the intentional provision of misinformation' related to such practices, 'contribute[s] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy,"); *Quinn v. Specialized Loan Servicing, LLC*, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); *Lane v. Bayview Loan Servicing, LLC*, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); *Church v. Accretive Health, Inc.*, No. 15-15708, 2016 U.S. App. LEXIS 12414 *7-11 (11th Cir. July 6, 2016) (same); *see also Mogg v. Jacobs*, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

64. Moreover, Congress has explicitly described the FDCPA as regulating "abusive practices" in debt collection. 15 U.S.C. §§ 1692(a) – 1692(e). Any person who receives a debt collection letter containing a violation of the FDCPA is a victim of abusive practices. *See* 15 U.S.C. §§ 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive

debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses").

65. 15 U.S.C. § 1692e generally prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

66. 15 U.S.C. § 1692e(2)(a) specifically prohibits debt collectors from making false representations about "the character, amount, or legal status of any debt."

67. 15 U.S.C. § 1692e(10) specifically prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt."

68. For purposes of Plaintiff's claim under 15 U.S.C. § 1692e, the unsophisticated consumer would not be able to determine which debt collector is actually authorized to collect the debt from reading <u>Exhibits A & B</u>, which would lead the consumer to believe the debt collector was attempting to scam her.

69. Additionally, the unsophisticated consumer would not be able to determine whether payments pursuant to the settlement offers Northland made would satisfy the account, require the debt collector or creditor to update the status of the account for her credit report, or whether it would bring the account to a "current" status which would provide her relief from the anxiety of a past due and accelerated account, including the possibility that the creditor could file a lawsuit against the debtor at any time.

70. 15 U.S.C. § 1692f generally prohibits debt collectors from using any "unfair or unconscionable means to collect or attempt to collect any debt."

71. 15 U.S.C. § 1692f(1) specifically prohibits "the collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

72. 15 U.S.C. § 1692g states, in pertinent part:

**(a) Notice of debt; contents**

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that, unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

**(b) Disputed debts**

. . .

Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

### *The WCA*

73. The Wisconsin Consumer Act ("WCA") was enacted to protect consumers against unfair, deceptive, and unconscionable business practices and to encourage development of fair and economically sound practices in consumer transactions. Wis. Stat. § 421.102(2).

74. The Wisconsin Supreme Court has favorably cited authority finding that the WCA "goes further to protect consumer interests than any other such legislation in the country," and is "probably the most sweeping consumer credit legislation yet enacted in any state." *Kett* v. *Community Credit Plan, Inc.,* 228 Wis. 2d 1, 18 n.15, 596 N.W.2d 786 (1999) (citations omitted).

75. To further these goals, the Act's protections must be "liberally construed and applied." Wis. Stat. § 421.102(1); *see also* § 425.301.

76. To carry out this intent, the WCA provides Wisconsin consumers with an array of protections and legal remedies, including punitive damages. The Act contains significant and sweeping restrictions on the activities of those attempting to collect debts. *See* Wis. Stats. § 427.104.

77. The Act limits the amounts and types of additional fees that may be charged to consumers in conjunction with transactions. Wis. Stats. § 422.202(1). The Act also provides injured consumers with causes of action for class-wide statutory and actual damages and injunctive remedies against defendants on behalf of all customers who suffer similar injuries. *See* Wis. Stats. §§ 426.110(1); § 426.110(4)(e). Finally, "a customer may not waive or agree to forego rights or benefits under [the Act]." Wis. Stat. § 421.106(1).

78. Consumers' WCA claims under Wis. Stat. § 427.104(1) are analyzed using the same methods as claims under the FDCPA. Indeed, the WCA itself requires that the court analyze the WCA "in accordance with the policies underlying a federal consumer credit protection act," including the FDCPA. Wis. Stat. § 421.102(1).

79. Further, the Wisconsin Supreme Court has held that WCA claims relating to debt collection are to be analyzed under the "unsophisticated consumer" standard. *Brunton v. Nuvell Credit Corp.*, 785 N.W.2d 302, 314-15. In *Brunton*, the Wisconsin Supreme Court explicitly

adopted and followed the "unsophisticated consumer" standard, citing and discussing *Gammon v. GC Servs. Ltd. P'ship*, 27 F.3d 1254, 1257 (7th Cir. 1994). *Id.*

80. Wis. Stat. § 427.104(1)(g) states that a debt collector may not: "Communicate with the customer . . . in such a manner as can reasonably be expected to threaten or harass the customer."

81. Wis. Stat. § 427.104(1)(h) states that a debt collector may not: "Engage in other conduct which can reasonably be expected to threaten or harass the customer …."

82. Wis. Stat. § 427.104(1)(j) states that a debt collector may not: "Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist."

83. The Wisconsin Department of Financial Institutions, which is tasked with regulating licensed collection agencies, has found that "conduct which violates the Federal Fair Debt Collection Practices Act" can reasonably be expected to threaten or harass the customer. *See* Wis. Admin. Code DFI-Bkg 74.16(9) ("Oppressive and deceptive practices prohibited.").

84. The failure to effectively convey a customer's validation rights can reasonably be expected to harass the customer. *See* Wis. Admin. Code DFI-Bkg § 74.16(9) ("Oppressive and deceptive practices prohibited.") (prohibiting licensed Collection Agencies from engaging in conduct that "can reasonably be expected to threaten or harass the customer, including conduct which violates the Federal Fair Debt Collection Practices Act"); *see also Flood v. Mercantile Adjustment Bureau, LLC*, 176 P.3d 769, 776 (Colo. Jan. 22, 2008) (communicating that a consumer's rights would be preserved through oral communication effectively misleads the consumer into delaying the transmission of the consumer's written request for the verifying documentation, thereby causing the loss of valuable consumer rights violated state statute forbidding harassing, abusive, misleading, and unfair debt collection practices).

## COUNT I – FDCPA

85. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

86. Exhibit A represents to the consumer that Northland is authorized to collect the account and includes a settlement offer which purportedly expires by a particular deadline.

87. Exhibit B, which was mailed around shortly the consumer received Exhibit B, and would have been received before the settlement offer deadline stated in Exhibit A, represents to the consumer that ARS is authorized to collect the account.

88. The representations in Exhibits A & B are inconsistent with each other, and are confusing and misleading to the unsophisticated consumer.

89. The representations in Exhibits A & B would confuse and mislead the unsophisticated consumer as to whether Northland, ARS, or neither is actually authorized to collect the debt.

90. The representations in Exhibits A & B would confuse and mislead the unsophisticated consumer as to whether Northland or Citibank actually owned the debt.

91. The representations in Exhibits A & B would confuse and mislead the consumer as to whether the settlement offers in Exhibit A are still available to the consumer.

92. The representations in Exhibits A & B would confuse and mislead the consumer as to who to contact to dispute the debt and request the name and address of the original creditor.

93. Defendant violated 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(10), 1692f, 1692f(1), 1692g(a)(1), 1692g(a)(2), 1692g(a)(3), 1692g(a)(4), 1692g(a)(5), and 1692g(b).

## COUNT II – WCA

94. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

95. <u>Exhibit A</u> represents to the consumer that Northland is authorized to collect the account and includes a settlement offer which purportedly expires by a particular deadline.

96. <u>Exhibit B</u>, which would have been mailed around the same time the customer received <u>Exhibit B</u>, and would have been received before the settlement offer deadline stated in <u>Exhibit A</u>, represents to the customer that ARS is authorized to collect the account.

97. The representations in <u>Exhibits A & B</u> are inconsistent with each other, and are confusing and misleading to the unsophisticated consumer.

98. The representations in <u>Exhibits A & B</u> would confuse and mislead the unsophisticated consumer as to whether Northland, ARS, or neither is actually authorized to collect the debt.

99. The representations in <u>Exhibits A & B</u> would confuse and mislead the unsophisticated consumer as to whether Northland or Citibank actually owned the debt.

100. The representations in <u>Exhibits A & B</u> would confuse and mislead the unsophisticated consumer as to whether the settlement offers in <u>Exhibit A</u> are still available to the consumer.

101. The representations in <u>Exhibits A & B</u> would confuse and mislead the unsophisticated consumer as to who to contact to dispute the debt and request the name and address of the original creditor.

102. Defendant violated Wis. Stat. §§ 427.104(1)(g), 427.104(1)(h), and 427.104(1)(j).

## **CLASS ALLEGATIONS**

103. Plaintiff brings this action on behalf of two classes.

104. Class I ("Nationwide Class") consists of (a) all natural persons in the United States of America (b) who were sent a collection letter, (c) in the form of <u>Exhibit A</u> to the complaint in this action, (d) seeking to collect a debt for personal, family, or

17

household purposes, (e) where Citibank recalled the account from Northland prior to the settlement offer expiration date stated in Exhibit A, and (f) the account was recalled between February 8, 2018 and February 8, 2019, inclusive, (g) and the letter in the form of Exhibit A was not returned by the postal service.

105. Class II ("Wisconsin Class") consists of (a) all natural persons in the State of Wisocnsin (b) who were sent a collection letter, (c) in the form of Exhibit A to the complaint in this action, (d) seeking to collect a debt for personal, family, or household purposes, (e) where Citibank recalled the account from Northland prior to the settlement offer expiration date stated in Exhibit A, and (f) the account was recalled between February 8, 2018 and February 8, 2019, inclusive, (g) and the letter in the form of Exhibit A was not returned by the postal service.

106. Each class is so numerous that joinder is impracticable.

107. Upon information and belief, there are more than 50 members of each class.

108. There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether Defendant complied with the FDCPA and/or WCA.

109. Plaintiff's claims are typical of the claims of the members of each class. All are based on the same factual and legal theories.

110. Plaintiff will fairly and adequately represent the interests of the members of each class. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

111. A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

## JURY DEMAND

112. Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Classes and against Defendant for:

i. actual damages;

ii. statutory damages;

iii. attorneys' fees, litigation expenses and costs of suit; and

iv. such other or further relief as the Court deems proper.

Dated: February 8, 2019

**ADEMI & O'REILLY, LLP**

By: /s/ Mark A. Eldridge
John D. Blythin (SBN 1046105)
Mark A. Eldridge (SBN 1089944)
Jesse Fruchter (SBN 1097673)
Ben J. Slatky (SBN 1106892)
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
jblythin@ademilaw.com
meldridge@ademilaw.com
jfruchter@ademilaw.com
bslatky@ademilaw.com